**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

| | | |
|---|---|---|
| **MELISSA JOHNSON** | * | **CIVIL ACTION NO. 07-1484** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Melissa Johnson filed an application for childhood disability benefits on March 9, 2005, on behalf of her son, T. P., born October 3, 1998, based on a learning disability and Attention Deficit Hyperactivity Disorder ("ADHD"), with an onset date of August 15, 2004.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Teacher Questionnaire**.[1] Claimant's first-grade teacher reported that claimant had missed school often toward the end of the year due to crying spells and arm spasms. (Tr. 9). He had no problems acquiring and using information. (Tr. 10). He had no problems attending and completing tasks, except when he had a stubborn "episode." (Tr. 11). He had no problems in interacting and relating with others, or with moving about and manipulating objects. (Tr. 12).

As to caring for himself, claimant had crying spells when he was asked to do something that he did not want to do. (Tr. 14). However, the episodes were over within minutes as long as the tears were ignored. He had begun having body tremors (shaky arms) and increased heart rate, which seemed to be associated with unwanted instructions/activities. (Tr. 15). He had some days where he spoke very rapidly, but those were few and far between.

Claimant's academics were above average. (Tr. 16). His behavior towards authority and fellow students could not have been better. His problems stemmed from a lack in ability to control his disappointment or frustration.

---

[1] The report is undated, but indicates that it covers the period from August, 2006 to present.

**(2) Iberia School Board Health Referral dated May 11, 2007**. Claimant was referred by the school nurse for jerking of arms and dizziness. (Tr. 20). Dr. Jibran Atwi's assessment was seizures, for which he recommended an EEG. He wrote a note indicating that claimant's mother might miss a lot of work due to her child's medical condition, at least until the child saw a specialist. (Tr. 21).

**(3) Evaluation Report from Iberia Parish School Board dated May 21, 2003**. Claimant was referred for evaluation because he was found at risk in the area of communications-fluency. (Tr. 95). He reportedly got along well with other children. He had a nebulizer and an asthma pump, but had only used it once that year and once the previous year. (Tr. 96). Claimant's mother was concerned about claimant's stuttering and poor attention span.

Claimant's developmental milestones were reached at expected age levels. His sleep habits were normal. Self-help skills were age-appropriate. He still wet the bed during the night.

Claimant was able to attend to task for an appropriate length of time. (Tr. 97). He was distractible, but cooperative.

In conclusion, the data obtained in the assessment process showed that claimant's overall development according to screening results was within acceptable limits. (Tr. 101). Pre-academic readiness skills were also appropriate. He had no

dysfluencies in speech. Claimant was not eligible for special education services, and was classified Non-Exceptional.

Claimant's teacher saw a vast improvement in claimant's work. (Tr. 105). He was even more willing to try things independently. However, his conduct was not up to standards.

**(4) Reports from Dr. Albert M. Gutierrez dated December 1, 2004 and March 24, 2005**. On December 1, 2004, claimant was referred for evaluation for a murmur which was detected during an asthma episode. (Tr. 109). He had no cardiac symptoms.

On examination, Dr. Gutierrez found a grade 2/6 mid-frequency regurgitant systolic murmur at the lower left sternal border. (Tr. 110). A 12-lead EKG revealed a sinus rhythm with a heart rate of 96 b/min. and no chamber enlargement or hypertrophy. Claimant's EKG was normal for his age. The systolic murmur on physical examination was consistent with that of tricuspid valve regurgitation.

On March 24, 2005, claimant was seen for a 2-dimensional color echocardogram for evaluation of a recently-detected murmur. (Tr. 107). He had been diagnosed with ADHD.

The diagnosis was tricuspid valve regurgitation of a mild degree, and normal LV systolic function and intracardiac anatomy.

Dr. Gutierrez cleared claimant for treatment for ADHD. (Tr. 108). Claimant was cleared to participate in all activities without any restrictions. SBE prophylaxis was not indicated for his condition.

**(5) Consultative Psychological Evaluation by Alfred E. Buxton, Ph.D., dated May 5, 2006**. Claimant was being treated for ADHD with Ritalin LA, 10 mgs. (Tr. 112). His mother reported that claimant had engaged in two reported unprovoked crying episodes, and that no such episodes had occurred prior to his taking medication. He resisted going to sleep, then slept well. His appetite was good.

Claimant's energy was good. He had good contact socially. His primary hobby or pleasure was sports.

Claimant's adaptive daily living skills appeared to be a bit subaverage. His mother complained that claimant was active, busy, and seemed to be quite talkative.

On examination, claimant had no sensory or motor handicap. His verbal receptive language skill was good, and expressive skill was fair. Dress and groom was good. Recent and remote memories were intact. His ability to attend and concentrate was fair with prompts, as claimant seemed to be bit distractible. Persistence was fair, as claimant was easily taken off-task.

Pace was even, with a rapid rate of performance and a normative response latency. Claimant was restless. His impulse control was fair for his age. His locus

of control was external.

Claimant's intellect appeared to be subaverage. His judgment and reflective cognition were fair. Reasoning was poor for his age. Cognitions were simple and concrete. Mood was even with spontaneous and animated affect.

Claimant had no evidence of any hallucinatory or delusional phenomena. He had no evidence of attempts to injure himself or others. His self-image was positive.

Claimant was alert, responsive, and oriented in three spheres, but was not oriented to date. He was polite, cooperative, and tried his best.

Administration of the Wechsler Individual Achievement Test–Second Edition yielded score of 72 in word reading, 69 in reading domain, 79 in numerical operations, 76 in math reasoning and domain, 72 in spelling, 79 in written expression, and 73 in written expression language domain. He received an 82 in listening comprehension and 81 in oral expression. (Tr. 113).

Claimant's academic skills were poorly developed relative to his current grade level placement and time of school year. He did not show academic readiness for promotion to the first grade level.

Dr. Buxton concluded that claimant was of subaverage intellect with commensurate adaptive daily living skill development. His level of competency was

subaverage, but apparently within marginally acceptable limits of calendar age expectancy.

Clinically, claimant presented with ADHD, with degree of impairment moderate to moderately severe and prognosis fair. He was on a psychoactive medication with some undesirable side effects. His teachers reported some benefit from the medication, but with some adverse effects, such as unprovoked crying spells. He also presented with an academic problem, secondary to being a "slow learner" or otherwise educationally handicapped with an arousal disturbance. The Global Assessment of Functioning ("GAF") score was 55, with the rating period being over the last month, and 50 for 11 months prior. (Tr. 114).

**(6) Childhood Disability Evaluation Form dated July 5, 2005**. Claimant was assessed for ADHD, learning disorder, and asthma. (Tr. 118). Christopher D. Garner, Ph.D., and Michael F. Halphen, M.D., determined that claimant's impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal the listings. Claimant had less than marked limitations as to acquiring and using information and attending and completing tasks, and no limitations as to interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being. (Tr. 121-22).

**(7) Records from Pediatric Group of Acadiana dated December 15, 2004 to July 29, 2005**. Claimant was seen for ADHD. (Tr. 126-31). He was prescribed Ritalin LA 10 mg. (Tr. 126). He was also prescribed an Albuteral inhaler as needed. (Tr. 127).

**(8) Records from Iberia Parish Special Education Services dated December 5, 2005**. Claimant was classified as other health impaired. (Tr. 133). His strengths were gross motor skills, attitude towards school, politeness, participation in class, friendliness towards classmates, and accepting suggestions. (Tr. 134). His support needs were poor word attack skills, difficulty recognizing alphabet letters, poor fine motor skills, difficulty concentrating, impulsivity, inconsistent performance, and achieving below grade in other content areas. He was making slow progress in kindergarten. It was recommended that he spend at least 21% of the day in resource classes. (Tr. 135).

**(9) Records from Iberia Comprehensive Community Health Center dated December 7, 2006 to January 29, 2007**. Claimant was treated for ADHD. (Tr. 148-151). He was prescribed Adderall, Depakote, and BuSpar. (Tr. 148).

**(10) Claimant and Claimant's Mother's Administrative Hearing Testimony**. At the hearing on February 15, 2007, claimant's mother, Melissa Johnson, testified that claimant was taking Adderall XR, Depakote, and BuSpar. (Tr.

8

156-57). She stated that he had had some infractions at school which his teachers thought could have been related to his medications. (Tr. 159). She reported that she took claimant back to the doctor to recheck his medications, because he was having tantrums. She said that the doctor had reduced his dosage of Adderall.

Claimant testified that he was in the first grade. His mother stated that his grades had not been good for that six-week period. She reported that his teacher had had a lot of problems with his refusing to take his tests.

Ms. Johnson reported that claimant had ADHD and anxiety. (Tr. 160). She stated that he had had some behavior problems in kindergarten. She said that he had repeated two years of kindergarten. (Tr. 161).

Claimant testified that he liked to watch television. He reported that he went to church. (Tr. 162). He stated that he wanted to play football when he grew up.

Ms. Johnson testified that claimant had a very low attention span. She said that she could not give him a lot of tasks at one time. (Tr. 163). She also reported that she did not think that his medications helped. She stated that he did not have any side effects from his current medications. (Tr. 164).

Additionally, Ms. Johnson stated that claimant had done some self-injuring type of behavior in the past, such as jumping from the dresser or top bunk. (Tr. 165). She also reported that he wet the bet, and bit his nails and scratched until he bled.

(Tr. 165-66). Additionally, she testified that he was forcing vomiting at school. (Tr. 165). His teacher had reported that he did not vomit at school any more, but had other behavior problems. (Tr. 166).

Ms. Johnson stated that claimant was being treated for asthma. She reported that he was taking Singulair. She said that he used a nebulizer as needed. (Tr. 167). He had no adverse effects from his asthma medication.

Additionally, claimant's mother testified that claimant was now sleeping. She stated that he was no longer wetting the bed. She reported that he was taking speech therapy twice a week at school. (Tr. 168). She also said that he was taking resource classes. (Tr. 169).

Claimant's mother stated that claimant took his medication as directed. (Tr. 171). She said that he had "anger rages" with his brothers and sisters. She reported that he also did that with his teachers. (Tr. 172-73).

**(11) The ALJ's Findings are Entitled to Deference**. Claimant argues that the ALJ erred in failing to find that he had at least two marked limitations or an extreme limitation in one domain, which would render him disabled under the Social Security listings.

To "functionally equal" the listings, a child's impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one

domain. 20 C.F.R. § 416.926a(a). These domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(1).

Claimant argues that the ALJ erred in finding that he had a less than marked limitation in the domain of "acquiring and using information," less than a marked limitation as to "attending and completing tasks, no limitation as to "interacting and relating with others," no limitation as to moving about and manipulating objects, and no limitation as to caring for himself. [rec. doc. 10, pp. 12-14]. He asserts, at the very least, the ALJ should have found a marked limitation as to acquiring and using information, and caring for himself.

Under the regulations, a "marked" limitation is defined as an impairment which "interferes seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(2). A child's day-to-day functioning may be seriously limited when his impairment limits only one activity or when the interactive and cumulative effects of his impairment limit several activities. *Id*. A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning that the Social Security

Administration ("SSA") would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*.

An "extreme" limitation is defined as an impairment which "interferes very seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(3). A child's day-to-day functioning may be very seriously limited when his impairment limits only one activity or when the interactive and cumulative effects of his impairment limit several activities. An "extreme" limitation also means a limitation that is "more than marked." *Id*. An "extreme" limitation is the rating that is given to the worst limitations. *Id*. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. *Id*. It is the equivalent of the functioning that the SSA would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id*.

As to acquiring and using information, claimant argues that he has a marked limitation, because he had failed kindergarten, had an IQ score of 69 in reading, and had problems with alphabet recognition and writing. [rec. doc. 10, pp. 12-13]. The ALJ determined that claimant had a less than marked limitation in this domain. (Tr. 30). While the ALJ acknowledged that claimant had had crying spells since being on medication for ADHD, claimant's mother reported that he had no side effects with his new medication. (Tr. 164). Additionally, claimant's teacher reported that claimant

12

had no problems as to acquiring and using information. (Tr. 10). This finding is further supported by Dr. Garner's evaluation, in which he found that claimant had a less than marked limitation as to acquiring and using information. (Tr. 121). As the ALJ's finding regarding this domain is supported by the evidence, it is entitled to deference.

Regarding the attending and completing tasks domain, claimant argues that there were complaints that he fidgeted, talked out of turn, disturbed other students, failed to stay on task, and interrupted others. [rec. doc. 10, p. 13]. The ALJ found that claimant had a less than marked limitation as to attending and completing tasks. (Tr. 31). She noted that Dr. Buxton had found that claimant's ability to attend and concentrate at the evaluation was fair with prompts, as claimant seemed to be distractible. This is supported by Dr. Buxton's report, in which he determined that claimant was "a bit" distractible. (Tr. 112). Dr. Buxton's finding that claimant was "a bit" distractible does not support a finding that he was significantly limited in this area.

Additionally, the state agency examiner, Dr. Garner, found a "less than marked" limitation in this area. (Tr. 121). Further, in the Child Search Evaluation Report, claimant's teacher noted that he was able to attend to task for an appropriate

length of time. (Tr. 97). This evidence does not support the requirements for a marked or extreme limitation under the regulations. Thus, this argument lacks merit.

Next, claimant argues that the ALJ erred in finding that he had no limitations as to interacting and relating to others. [rec. doc. 10, p. 13]. He asserts he has had several behavior problems, including willful disobedience. [rec. doc. 10, p. 14]. Additionally, he notes that he was in speech therapy because he was a stutterer.

The ALJ noted that it was opined in the Childhood Disability Evaluation Form that claimant had no limitations in this domain. (Tr. 32, 121). Additionally, claimant's teacher noted that he had no problems in interacting and relating with others. (Tr. 12). Further, the Child Search Evaluation Report indicated that claimant got along well with other children. (Tr. 95). In fact, his teacher noted that claimant's behavior towards authority and fellow students could not have been better. (Tr. 16). Thus, on this issue, the ALJ's finding is supported by the evidence.

As to moving about and manipulating objects, claimant argues that he had to miss the last two weeks of school because of crying spells and arm spasms. However, both Dr. Buxton and Dr. Garner noted no motor problems. (Tr. 112, 122). This is confirmed by claimant's teacher, who observed that claimant had no problems in moving about and manipulating objects. (Tr. 12). Thus, the ALJ's finding is entitled to deference.

Regarding caring for himself, claimant notes that he has been known to scratch himself and bite his nails until bleeding, jump from heights, have sleep disturbances, self-vomiting, and other similar behavior. [rec. doc. 10, p. 14]. However, claimant's mother testified that claimant's teacher had not reported those behavior problems that year. (Tr. 166). While his teacher wrote that claimant had had claimant had crying spells when he was asked to do something that he did not want to do, she noted that the episodes were over within minutes as long as the tears were ignored. (Tr. 14). Additionally, she observed that claimant had begun having body tremors (shaky arms) and increased heart rate, which seemed to be associated with unwanted instructions/activities. (Tr. 15). As noted by Dr. Garner, the overall level of limitation in this domain "minimal, at worst." (Tr. 122). Thus, the ALJ's finding is supported by the evidence.

Finally, as to health and physical well-being, claimant argues that he has ADHD and side effects from medication. [rec. doc. 10, p. 15]. The ALJ found no evidence of limitation in this domain. (Tr. 34). This finding is supported by Dr. Garner, who found a lack of limitation in this area. (Tr. 122).

Claimant further asserts that the Commissioner should have waited until additional medical records were received before ruling on this issue. However, he does not indicate what these records would have shown. To establish prejudice,

15

claimant must show that counsel "could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). As claimant has not shown how these additional records might have altered the result, this argument lacks merit.

Accordingly, based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR**

**THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

September 12, 2008, Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE